Date signed March 29, 2016



WENDELIN I. LIPP
U. S. BANKRUPTCY JUDGE

<br>

## UNITED STATES BANK RUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at Greenbelt

In re:                                           :
                                                 :
Robert Horace Wilson,                            :      Case No.: 12-32715-WIL
                                                 :      Chapter 7
                                                 :
      Debtor.                            :

---

## <u>MEMORANDUM OPINION</u>

     Before the Court are The James Adkins Living Trust's Motion to Dismiss or Convert

(the "Motion") and the Debtor's Answer thereto.    The Motion seeks dismissal of the Debtor's

bankruptcy case under 11 U.S.C. § 707(a) or, in the alternative, conversion of this case to a case

under Chapter 11 of the Bankruptcy Code.    The Court conducted a two-day trial on the Motion

on October 29, 2014, and May 4, 2015.    At the conclusion of the trial, the Court took the matter

under advisement and gave the parties thirty (30) days to file post-trial briefs.    Only The James

Adkins Living Trust (the "Trust" or "Movant") submitted a post-trial brief.    The Court has

considered the Motion, the Debtor's Answer thereto, the evidence and testimony presented at

trial and the post-trial brief.    For the following reasons, the Motion is granted.

I.      **Jurisdiction**

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. §157(a) and Rule 402 of the Local Rules of the United States District Court for the District of Maryland.    This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b).

II.     **Findings of Fact**

The following facts are relevant to the Court's decision and are either undisputed or supported by the evidence presented at trial.[1]    The Trust is a creditor of the Debtor based on a loan made to the Debtor by James Adkins in 2008.    The Debtor defaulted on his obligations under the loan documents causing James Adkins to file a lawsuit against the Debtor in the Superior Court for the District of Columbia.    Thereafter, on February 27, 2012, the Trust, which was substituted as a party in the lawsuit for James Adkins, was awarded a judgment against the Debtor in the amount of $1,342,087.97, plus a judgment for possession of the property securing the loan.    The Debtor failed to turn over the assets as ordered by the Superior Court.    Consequently, the Trust sought post-judgment collection and contempt remedies against the Debtor.    Thereafter, on December 21, 2012 (the "Petition Date"), the Debtor commenced the instant bankruptcy case by filing a voluntary petition under Chapter 7 of the United States Bankruptcy Code (hereafter, the "Bankruptcy Code").

The Debtor and his non-filing spouse are both practicing physicians, the Debtor being an orthopedic surgeon and his spouse being a dermatologist.    They have six children.    As of the Petition Date, all six children lived at home along with the Debtor's mother, a former au pair, and a niece and a nephew, both of whom were at least 18 years of age as of the Petition Date.    The

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

Debtor filed his bankruptcy schedules and statement of financial affairs on January 24, 2013. The

Debtor's original schedules were admitted into evidence as Debtor's Exhibit No. 2. Schedule A

identifies one parcel of real property located at 2412 Norbeck Farm Place, Olney, Maryland 20822

owned by the Debtor and his spouse, Dr. Paula Bourelly ("Dr. Bourelly"). Schedule B lists,

among other assets, the Debtor's 50% ownership interest in Spike Club, LLC with an assigned

value of $1.00. Schedule B also lists Debtor's 2% ownership interest in Capitol Endoscopy with

an assigned value of $19,000.00. Schedule D lists Peter Mann, Esquire (the Trust's attorney) as

having a contingent, unliquidated and disputed secured claim in the amount of $1,348,542.37

based on the Trust's judgment against the Debtor. Schedule D also lists two claims held by

Merrill Lynch secured by the Norbeck Farm property, and a judgment in favor of Premier Bank,

Inc. in the amount of $369,123.76.[2] Debtor's original Schedule E reflects that there are no

creditors holding unsecured priority claims. Debtor's original Schedule F incudes various credit

card debt totaling $30,785.00 and a claim in favor of Dr. Bourelly in the amount of $100,000.00

based on a "Promissory Note." Debtor's original Schedule F also includes numerous claims

---

[2] Premier Bank's claim was secured by the Norbeck Farm Property and a building located at 5335 Georgia Avenue, N.W., Washington, D.C. (the "Georgia Avenue Property") out of which Spike Club, LLC operates a gentlemen's club. Premier Bank, Inc. also filed a Motion to Dismiss the Debtor's case under 11 U.S.C. §707(a). The Debtor, Premier Bank and various other parties eventually reached a settlement. In connection with the settlement agreement, 5335 Georgia Avenue, N.W., LLC, an entity owned solely by Dr. Bourelly, purchased the Georgia Avenue Property for $500,000.00, thereby allowing Spike Club to pay Premier Bank $500,000.00. Dr. Bourelly testified that her purchase of the building was an investment decision unrelated to pending foreclosure proceedings commenced by Premier Bank. After approval of the settlement agreement, Premier Bank withdrew its Proof of Claim, its Motion to Dismiss and other pleadings on June 5, 2014, effectively removing itself from these proceedings. Of the $500,000.00 purchase price paid for the Georgia Avenue Property, approximately $370,000.00 was paid by Dr. Bourelly's business, approximately $100,000.00 was paid by the Debtor and $36,000.00 was paid by Spike Club, LLC to 5335 Georgia Avenue, N.W., LLC to cover rent for the first six months post-sale. Dr. Bourelly testified that she did not know the source of the Debtor's $100,000.00 contribution to the purchase of the Georgia Avenue Property. As of the trial, Spike Club, LLC was four months behind in rent owed to Dr. Bourelly/5335 Georgia Avenue, N.W., LLC. Despite the past-due rent, Dr. Bourelly had not made any effort to evict Spike Club from the premises.

totaling $1,285.00 held by Professional Account Management, LLC, a collection agency for the District of Columbia.   Debtor testified that he believed these claims were for parking tickets. Debtor testified that the $30,785.00 credit card balance was incurred in the ordinary course of business and was a balance that he typically carried.   Debtor further testified that he obtained the $100,000.00 from Dr. Bourelly in connection with the purchase of his business and that he has never made a payment to Dr. Bourelly on the Promissory Note despite it having a maturity date of December 31, 2013.

The Chapter 7 Trustee informed the Court at trial that the Debtor's bankruptcy case is an "asset case" and that upon withdrawal of Premier Bank's Proof of Claim, the Trust represents 99% of the filed claims in Debtor's case.

Debtor's original Schedule I states that the Debtor is employed as a physician with Providence Hospital in Washington, D.C.   Debtor's average monthly income is listed as $17,961.78, including a "Satuday Combination of Soirry Staefe" in the amount of $3,000.00. Debtor's original Schedule I lists Dr. Bourelly's average monthly income from her dermatology practice, Olney Dermatology Associates, as $10,993.67.[3]   The combined average monthly income on Debtor's original Schedule I totals $28,955.45.   Debtor's original Schedule J lists average monthly expenses of $29,098.33, and reflects a monthly household deficit of $142.88. Examples of specific monthly expenses include: $7,900 for mortgage payments; $2,340.00 for household utilities; $2,000.00 for home maintenance; $7,400.00 for food; $1,200 for transportation (not including car payments); $1,050 for recreation, $200.00 for pet expenses and $500.00 for vehicle maintenance.   Debtor testified at trial that his initial Schedules I and J were not accurate and that he did not know what the "Satuday Combination of Soirry Staefe" was.   He

---

[3] Dr. Bourelly is the sole owner of Olney Dermatology Associates.

4

further testified that he knew his schedules would have to be "improved and tweaked."

There was significant focus at trial on the Debtor and Dr. Bourelly's household operations.   Debtor testified that he does not have a bank account titled in his name.   The bank account that he owned prior to the Petition Date was closed after a writ of attachment was issued. He testified that he gives his paycheck from Providence Hospital to Dr. Bourelly for deposit into her checking account at SunTrust Bank.[4]   This is the same account into which Dr. Bourelly deposits her salary checks and from which all household bills are paid, including mortgage payments, utilities, cable and any other regular monthly household expenses.   Although Dr. Bourelly testified that she and Dr. Wilson never sat down and decided who would pay what bills, it was agreed that Dr. Bourelly paid the family's expenses from her checking account.   Dr. Bourelly testified that she opened her SunTrust checking account to have more control of her finances after the Debtor was using funds from their former joint account to pay for his business expenses.   As of the Petition Date, Debtor could obtain cash from Dr. Bourelly or by accessing her SunTrust account.

On February 7, 2013, the Trust filed the Motion alleging that the Debtor filed his bankruptcy case in bad faith.   Debtor filed his Answer to the Motion on February 17, 2013, and a status hearing was held on April 8, 2013, at which various deadlines were set and the matter was scheduled for trial.   On May 28, 2013, the Debtor filed amended Schedules B, C, F, I and J, all of which were admitted into evidence at trial.[5]   The amended schedules were prepared with the assistance of Richard Block, a certified public accountant retained by the Debtor to help revise the

---

[4] As of trial, Debtor no longer received a physical paycheck from his employer.   Rather, Debtor's salary was paid via a debit card from which he transferred funds to Dr. Bourelly's SunTrust account.

[5] The changes to Schedules B and C are irrelevant for purposes of this Memorandum Opinion, as are any changes reflected in the second amended Schedule B filed on July 12, 2013, and the second amended Schedule C filed on October 14, 2013.

Debtor's Schedules I and J and to determine whether the Debtor and Dr. Bourelly operate as a single economic unit or separate units.   The only difference the Court can discern between the Debtor's original Schedule F and the amended Schedule F is that the amended version lists "Paula Bourelly, M.D." as the creditor as opposed to "Paula Bourelly" with respect to the $100,000.00 Promissory Note.   Other than that, the claims listed on the amended Schedule F are identical to the original version.   The changes to the Debtors' Schedules I and J are far from minor, however. The Debtor's amended Schedule I differs significantly from his original Schedule I in that it increases the Debtor's "payroll taxes and Social Security" from $5,116.61 to $8,391.00, increases the Debtor's "insurance" from $18.31 to $925.00, increases his "Flex Spending" from $416.67 to $625.00, and adds a voluntary "TSA" (Tax Sheltered Annuity) expense of $1,369.00.   Debtor's amended Schedule I also omits several expenses included in his prior version, including the $3,000.00 monthly income attributed to "Satuday Combination of Soirry Staefe," and $1,704.00 in supplemental life insurance.   The amended Schedule I reflects a total increase in Payroll Deductions of $1,628.85 for the Debtor.   The amended Schedule I also includes additional monthly income for the Debtor in the amount of $750.00 from "Capital Endoscopy" and additional monthly income for Dr. Bourelly in the amount of $24,116.00 from Olney Dermatology.   In total, the Amended Schedule I reflects a combined average monthly income of $48,760.00.   Debtor testified at trial that he has also started working at Howard University.   Although salary terms were not finalized as of trial, Debtor testified that his employment with Howard University should provide an additional $100,000.00 in income.[6]

The changes to Debtor's Schedule J are even more significant.   First and foremost, the

---

[6] Debtor's testimony regarding his employment with Howard University was inconsistent.   At one point Debtor testified that he had recently started working at Howard University but then he testified that he has been teaching at Howard University for almost twenty years and has been an associate professor there for about 12 years.

amended Schedule J divides expenses between the Debtor and Dr. Bourelly so that they each

submitted an individual Schedule J (together, the "amended Schedule J").   Mr. Block testified

that the amended Schedule J was based, in part, on a QuickBooks general ledger of Dr. Bourelly's

checking account for the period January 1, 2013 to April 30, 2013.   Mr. Block instructed the

Debtor and Dr. Bourelly to review the ledger and identify which expenses were his, hers or joint.

Mr. Block then created a spreadsheet of the family's expenses based on the input from the Debtor

and Dr. Bourelly.   The amended Schedule J attributes certain monthly expenses to either the

Debtor or Dr. Bourelly, and divides certain shared expenses between the two.   Some of the joint

expenses included in the amended Schedule J were divided equally between the Debtor and Dr.

Bourelly, namely: the mortgages; telephone, cable, and "Estimated Tax Payments."   Other joint

monthly expenses were attributed in a greater amount to either the Debtor or Dr. Bourelly.   For

example, Debtor's electricity and heating expense is $844.00 while Dr. Bourelly's is $936.00;

Debtor's Internet expense is $33.00 while Dr. Bourelly's is $26.00; Debtor's home maintenance

expense is $1,271.00 while Dr. Bourelly's is $409.00; Debtor's food expense is $1,531.00 while

Dr. Bourelly's is $1,464.00; Debtor's transportation expense is $802.00 while Dr. Bourelly's is

$250.00; Debtor's recreation expense is $2,325.00 while Dr. Bourelly's is $271.00; Debtor's

homeowner's insurance is $232.00 while Dr. Bourelly's is $0; the Debtor's personal hygiene and

pet expenses total $361.00 while Dr. Bourelly's is $810.00; and Debtor's school/daycare expense

is $751.00 while Dr. Bourelly's is $749.00.   Some of these differences were explained at trial.

For instance, the Debtor's increased recreation expense includes the cost of a country club

membership[7] and Washington Wizards season tickets.   The Debtor, Dr. Bourelly and Mr. Block

---

[7] Four country club statements were admitted into evidence as Movant's Exhibit No. 16.   The monthly
statements ranged from $775.60 to $1,021.35.   The April 2013 Statement totaled $1,633.29, but this
amount included a carry-over balance of $973.68 from March 2013.

all testified that these were the Debtor's expenses.    Specifically, Debtor testified that the country club membership and the basketball tickets provide a means to increase his business productivity by promoting his medical practice.    A "Wizards 2012-2013 Full Season Ticket Payment Receipt" was admitted into evidence as Movant's Exhibit No. 15.    Exhibit No. 15 reflects that $7,802.00 was paid via credit card and that the account name for the season tickets is Dr. Robert Wilson. Debtor testified that he paid for the Washington Wizards season tickets for the 2012-2013 Season but was looking to share the expense for the 2014 season with another party.    Neither the country club membership nor the Washington Wizards season tickets were claimed as a business expense on the Debtor's Joint Tax Return for 2012, admitted into evidence as Movant's Exhibit No. 7. Despite Debtor's testimony that the country club membership is a business expense, the Debtor admitted that Dr. Bourelly uses the county club's restaurant and club room for dining and brings the children to the club to swim in the pool.    The Debtor's increased travel/transportation expenses were based on work-related travel not paid for by his employer.    Dr. Bourelly explained her increased pet expenses by testifying that she pays for all the animal care for her dog, cat and fish.    There was no explanation at trial for why the other joint expenses were not divided equally between the Debtor and Dr. Bourelly, namely: electricity and heating, Internet, home maintenance, school/daycare, and homeowner's insurance.

The amended Schedule J reflects total monthly expenses for the Debtor of $19,507.00, resulting in a monthly deficit of $5,424.00 attributed to him.[8]    The amended Schedule J reflects total monthly expenses for Dr. Bourelly of $15,395.00, resulting in a monthly net income of $19,282.00 for her.    Based on these numbers, the Trust's forensic accounting expert (John N.

---

[8] It is unclear whether part of the Debtor's education expenses includes college tuition for his nephew. Debtor testified at trial that his nephew is "in college and we're taking care of that[.]"    *See* Trial Tr. 27, Oct. 29, 2014.

Davidson, CPA, CVA, CFF), concluded that the Debtor is solvent because his monthly household income exceeds his monthly household expenses by $13,858.00.   Mr. Davidson's conclusion contrasted with Mr. Block's conclusion that Debtor is insolvent on both a balance sheet and income basis.

Part of the disagreement over the Debtor's solvency was based on whether the Debtor and Dr. Bourelly's finances should be treated as a single economic unit or separate economic units. Mr. Davidson concluded that the Debtor and Dr. Bourelly are a single economic unit based on the way they operate their household and finances (single bank account into which both salaries are deposited and from which household and personal bills are paid).   Mr. Block initially disagreed with Mr. Davidson.   He testified that the Debtor and Dr. Bourelly are separate economic units with respect to their businesses and that they have joint household obligations.   Mr. Block testified that he prepared two expert reports in connection with the Debtor's bankruptcy case, the first dated May 25, 2013, and the second dated July 25, 2013.[9]   Both reports conclude that Dr. Bourelly is a separate economic unit on the basis of her income and expenses.   Mr. Block testified that he created the second report to emphasize his conclusion that the Debtor and Dr. Bourelly are separate economic units and to better address tax and balance sheet insolvency issues.   On cross examination, however, Mr. Block narrowed his conclusion that Dr. Bourelly is a separate economic unit on the basis of her income and expenses.   Although Mr. Block maintained that Dr. Bourelly's business income (as opposed to salary) is not part of the household's income, he conceded that they operate as a joint economic unit with respect to joint expenses but separate economic units in terms of the Debtor's travel, entertainment and continuing education expenses despite the fact that they pay these expenses out of Dr. Bourelly's bank account.   Mr. Block

---

[9] Both reports were admitted into evidence as Movant's Exhibit Nos. 18 and 19.

further conceded that despite his earlier deposition testimony to the contrary, the fact that Dr. Bourelly and the Debtor own property together, have joint expenses and share their income should be considered in the economic unit analysis.   Ultimately, the disagreement between the two experts was narrowed down to whether Dr. Bourelly's business income should be considered part of the household's income and whether the Debtor's business-related expenses should be treated differently from other joint expenses.

The "Estimated Tax Payments" reflected in the amended Schedule J apportions $5,464.00 to the Debtor and another $5,464.00 to Dr. Bourelly, for a total of $10,928.00.   Although Debtor initially testified that he believed this estimated tax payment was based on his income, it was later clarified by Debtor's counsel and other witnesses that this is the estimated tax liability for the income earned by Dr. Bourelly's dermatology practice.   It is undisputed that the Debtor never paid any estimated taxes for Olney Dermatology.   It is further undisputed that Dr. Bourelly distributed sufficient funds from her business to pay the estimated taxes.   In fact, Mr. Block's amended expert report includes the following statement: "Dr. Bourelly did not take distributions from her corporation in 2012 other than to pay income taxes on its profits."   *See* Movant's Ex. No. 19.   Nevertheless, Mr. Block equally divided the estimated tax liability for Dr. Bourelly's business profits between the Debtor and Dr. Bourelly because they file a joint tax return.   Mr. Block reasoned that if there was ever a tax assessed for this income, the Debtor and Dr. Bourelly would be jointly liable.   Mr. Davidson countered that there is no tax liability for Dr. Bourelly's business to attribute to the Debtor because Dr. Bourelly pays the estimated taxes in advance.   Mr. Davidson further testified that Dr. Bourelly's business had $464,886.00 in available cash as of December 31, 2012, more than enough to cover any tax liability for the business.   Moreover, Mr. Davidson reasoned that if Dr. Bourelly ever failed to pay the estimated taxes, thereby resulting in a

10

tax liability, the Debtor could elect to file a separate tax return to avoid any such liability for Dr. Bourelly's business.

On October 27, 2014, two days before the scheduled trial herein, the Debtor filed an amended Schedule E disclosing a contingent, unliquidated and disputed claim in the amount of $1,240,243.93 held by the District of Columbia Office of Tax and Revenue.   The amended Schedule E was admitted into evidence as Debtor's Exhibit No. 14 at trial.   The tax claim set forth on amended Schedule E matches the amount set forth in a proof of claim filed by the "DC Gov't Office of Tax & Revenue" in Spike Club, LLC's bankruptcy case (the "DC Tax Claim"), which was admitted into evidence as Movant's Exhibit No. 23.   The attachments to the DC Tax Claim identify the taxes due as Corporate Franchise taxes ($618,422.01) and Sales & Use taxes ($621,821.92) owed by Spike Club, LLC for years 2007-2014 and for which no tax returns were filed.   The District of Columbia Office of Tax and Revenue has not asserted a claim against the Debtor in his bankruptcy case based on his ownership interest in Spike Club, LLC.   Nevertheless, Debtor argued at trial that the District of Columbia *could* assert its approximately $1.2 million claim against the Debtor as a "responsible person" based on his ownership interest in Spike Club, LLC.   Despite Debtor's assertion at trial and as represented in the amended Schedule E, it was unrefuted that any liability the Debtor could have for Spike Club LLC's tax obligations would be limited to the Sales & Use portion of the District of Columbia's claim.

**III.    Analysis**

The Motion seeks dismissal of the Debtor's case under 11 U.S.C. § 707(a) or conversion to Chapter 11 based on the Debtor's alleged lack of good faith in filing his bankruptcy petition. Section 707(a) provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing

11

and only for cause, including--

>   (1) unreasonable delay by the debtor that is prejudicial to creditors;

>   (2) nonpayment of any fees or charges required under chapter 123 of title 28;
>   and

>   (3) failure of the debtor in a voluntary case to file, within fifteen days or such
>   additional time as the court may allow after the filing of the petition
>   commencing such case, the information required by paragraph (1) of section
>   521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).   The three illustrative grounds for dismissal contained in § 707(a) are

non-exclusive.[10]   *See McDow v. Smith*, 295 B.R. 69, 74 (E.D. Va. 2003).   Despite the

non-exclusive nature of the factors set forth in § 707(a), Courts are divided on whether a Chapter 7

case can be dismissed under § 707(a) for bad faith.   To date, several courts of appeals have

supported bad faith dismissals under § 707(a).   *See Krueger v. Torres (In re Krueger)*, 812 F.3d

365, 371 (5th Cir. 2016); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*,

719 F.3d 1253 (11th Cir. 2013); *Perlin v. Hitachi Capital American Corp. (In re Perlin)*, 497 F.3d

364 (3d Cir. 2007) and *Industrial Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124 (6th Cir.

1991)).   "Although the Court of Appeals for the Fourth Circuit has not specifically addressed

whether a debtor's bad faith may be cause to dismiss a Chapter 7 bankruptcy petition under §

707(a), lower courts in this Circuit have addressed the issue and have concluded that cause exists

under § 707(a) to dismiss a petition that is filed in bad faith."   *In re Watson*, No. 10-1292, 2010

WL 4497477, at *3 (Bankr. N.D.W.Va. Nov. 1, 2010)(citations omitted).   In *McDow v. Smith*, the

United States District Court for Eastern District of Virginia, heeded the Sixth Circuit's holding in

*In re Zick* that: "dismissals for lack of good faith 'should be confined carefully and...generally

utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources

---

[10] 11 U.S.C. § 102 sets forth "Rules of Construction" for certain terms contained in the Bankruptcy Code.
Section 102(3) provides: "'includes' and 'including' are not limiting [.]"   *See* 11 U.S.C. § 102(3).

of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.'" *McDow v. Smith,* 295 B.R. at 81 (quoting *In re Zick,* 931 F.2d at 1128).

This Court agrees that bad faith constitutes "cause" for dismissal under § 707(a) and further agrees that such relief should be used sparingly and reserved for egregious cases.   As explained in *McDow v. Smith*, "a debtor's 'bad faith' or 'lack of good faith' is evidenced by the debtor's deliberate acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code."  *McDow v. Smith*, 295 B.R. at 74.   In comparing this general standard of "bad faith" to the illustrative grounds for dismissal in § 707(a), the *McDow* Court opined that the examples in § 707(a) all involve a debtor's acts or omissions that may reflect a debtor's misuse of the bankruptcy process.  *Id.*   "It follows, therefore, that a debtor's bad faith acts or omissions fall into the same class of such acts or omissions as do the three illustrative examples of 'cause' for dismissal set forth in § 707(a), namely the class of acts or omissions that involves a misuse of the bankruptcy process."  *Id.*   The Court then concluded that with respect to § 707(a)*,* a debtor's "bad faith acts or omissions" may, in the totality of the circumstances, constitute cause for dismissal under § 707(a).  *Id.* at 75.   The *McDow* Court found support for this view from other courts reaching the same conclusion, including two circuit courts—the Third and Sixth—and from caselaw in the Fourth Circuit and elsewhere construing similar dismissal for cause provisions elsewhere in the Bankruptcy Code.  *Id. (*citing to numerous cases including *In re Zick,* 931 F.2d at 1126 and *Carolin Corp. v. Miller*, 886 F.2d 693-698-700 (4th Cir. 1989)).   The reasoning in *In re Perlin*, 497 F.3d 364 (3d Cir. 2007) is also persuasive on this point.   In *Perlin*, the Third Circuit Court of Appeals analyzed the legislative history of § 707 and concluded that there is no indication that the BAPCPA modifications to § 707(b) imply anything about the

13

dismissal of bankruptcy cases under § 707(a).   *Id.* at 371.   The Third Circuit stated that although the BAPCPA amendments to § 707(b) effectively tightened the dismissal procedures for consumer filings, "[t]here is no indication that Congress intended, contrarily, to restrict a bankruptcy court's discretion in deciding motions to dismiss under section 707(a)."   *Id.*

As for determining bad faith, courts consider a variety of factors under the "totality of the circumstances" test, including:

> (1) The debtor's concealment or misrepresentation of assets and/or sources of income, such as the improper or unexplained transfers of assets prior to filing;
>
> (2) The debtor's lack of candor and completeness in his statements and schedules, such as the inflation of his expenses to disguise his financial well-being;
>
> (3) The debtor has sufficient resources to repay his debts, and leads a lavish lifestyle, continuing to have excessive and continued expenditures;
>
> (4) The debtor's motivation in filing is to avoid a large single debt incurred through conduct akin to fraud, misconduct, or gross negligence, such as a judgment in pending litigation, or a collection action;
>
> (5) The debtor's petition is part of a "deliberate and persistent pattern" of evading a single creditor;
>
> (6) The debtor is "overutilizing the protection of the Code" to the detriment to his creditors;
>
> (7) The debtor reduced his creditors to a single creditor prior to filing the petition;
>
> (8) The debtor's lack of attempt to repay creditors;
>
> (9) The debtor's payment of debts to insider creditors;
>
> (10) The debtor's "procedural gymnastics" that have the effect of frustrating creditors;
>
> (11) The unfairness of the debtor's use of the bankruptcy process.

*See McDow v. Smith*, 295 B.R. at 79 n.22.   The factors set forth in the pre-BAPCPA case of *Green v. Staples (In re Green),* 934 F.2d 568 (4th Cir.1991) are also instructive when considering a motion to dismiss under § 707(a).   *See In re Matthews*, No. 13-10521, 2013 WL 1385221, at *8 (Bankr. E.D. Va. April 3, 2013).   The *Green* factors are:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
>
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
>
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>
> (5) Whether the petition was filed in good faith.

*Id.*   Although the presence of only one of the aforementioned factors is insufficient to dismiss a case under § 707(a), dismissal may be warranted where a combination of these factors are present. *See In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995).   This is consistent with caselaw within the Fourth Circuit, including prior decisions of this Court, holding that a debtor's ability to repay his debts, by itself, is insufficient evidence of bad faith to justify dismissal under § 707(a). *See McDow v. Smith*, 295 B.R. at 78.   Some courts have gone as far as holding that a debtor's ability to repay his debts may not even be the *primary* basis for a bad faith dismissal under § 707(a).   *See In re Perlin*, 497 F.3d at 374 (concluding that the legislative history behind § 707(a) indicates that a "debtor's substantial financial means" may not be the exclusive or primary basis for a bad faith dismissal under § 707(a)).   For purposes of this Memorandum, the Court need not decide whether a debtor's ability to repay his creditor could be a primary basis for a finding of bad faith or merely a supporting factor.   Rather, the Court finds that the Debtor's manipulation of his

bankruptcy schedules, combined with several other factors, warrants the dismissal of this case.

Preliminarily, the Court will address two "continuing objections" made by Debtor's counsel throughout the trial.   First, Debtor's counsel maintained that Debtor's living expenses are irrelevant to the motion to dismiss because Debtor's debts are primarily business debts, thereby precluding consideration of the factors considered under the consumer debt provisions of § 707(b).[11]   Counsel argued that dismissal under § 707(a) is restricted to the three enumerated factors set forth therein, and the factors considered under the "totality of the circumstances" analysis governing motions to dismiss for abuse in consumer debtor cases are inapplicable to this case.   Debtor's reading of § 707(a) is too narrow.   As set forth above, the three illustrative grounds for dismissal contained in § 707(a) are non-exclusive.   *See McDow v. Smith*, 295 at 74. Moreover, this Court holds that bad faith or a lack of good faith constitutes "cause" for dismissal under § 707(a).   Accordingly, the Court looks to the totality of the Debtor's financial circumstances to determine whether the petition was filed in bad faith.   The mere fact that the Debtor's debts are primarily business debt does not change the analysis.   *See In re Rahim*, 442 B.R. 578, 582 (Bankr. E.D. Mich. 2010); *see also In re Piazza*, 451 B.R. 608, 613-614 (Bankr. S.D. Fla. 2011) *aff'd sub nom. Piazza v. Nueterra Healthcare Physical Therapy, LLC*, 469 B.R. 388 (S.D. Fla. 2012) *aff'd sub nom. In re Piazza*, 719 F.3d 1253 (11th Cir. 2013)("Whether a

---

[11] Section 707(b) of the Bankruptcy Code provides, in relevant part:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1).   Section 707(b)(3) provides guidance on whether the granting of relief would be considered abusive and instructs courts to consider whether the petition was filed in bad faith or whether the totality of the circumstances of the debtor's financial situation demonstrates abuse.   11 U.S.C. § 707(b)(3).

debtor is a consumer or non-consumer debtor is, under the new majority view, irrelevant to whether a Chapter 7 case may be dismissed for bad faith [under § 707(a)].").

Second, counsel maintained at trial that the Court is restricted to considering the Debtor's financial circumstances as of the Petition Date.   Accordingly, counsel objected to the introduction of evidence related to Debtor's post-petition finances.   The Court notes that Debtor's continuing objection on this point throughout the trial contradicts arguments made in his Answer to the Motion to Dismiss.   In his Answer, Debtor stated: "[G]iven that this is a contested matter which involves a potential conversion to Chapter 11, the Bankruptcy Court's review of income and expenses should not be restricted to those existing on or before the Petition Date herein."   Debtor further stated: "Consequently, any review of a Motion to Convert or Dismiss should involve an examination of prospective changes to income and expenses which may occur after the Petition Date in any comparative Chapter 11."   The Court agrees with Debtor's initial analysis.   The appropriate standard for bad faith dismissals under § 707(a) is the totality of the Debtor's financial circumstances, which includes an examination of the Debtor's ability to repay his creditors.   *See McDow v. Smith*, 295 B.R. at 79.   An appropriate method to establish whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid through a hypothetical Chapter 13 (or Chapter 11) plan.   *See In re Crink,* 402 B.R. 159, 172-173 (Bankr. M.D.N.C. 2009)(discussing a debtor's ability to repay in the § 707(b) context but as discussed above, the same factors are applicable to the § 707(a) analysis).   Court's evaluate a debtor's ability to pay by looking to the debtor's future income and expenses, as well as the debtor's monthly income and expenses as disclosed in Schedules I and J.   *Id.* at 173.   Courts may further consider whether the expenses claimed by a debtor can be reduced significantly without depriving the debtor or the debtor's dependents of "adequate food, clothing, shelter, or other

17

necessities of life." *Id.* Nevertheless, this issue is a red herring (one of several presented by the Debtor) because, as discussed below, the Court finds that as of the Petition Date, the Debtor had the ability to make a considerable distribution to his creditors.

Having addressed the Debtor's continuing objections, the Court will move on to the heart of the matter—is there sufficient cause to dismiss this case for bad faith? At first glance, this case does not pass the "smell" test. It stretches credulity that a Debtor with a monthly household income of $48,760.00 and seemingly lavish expenses can qualify for Chapter 7 relief. On closer examination however, the answer is not that simple. First, it is clear that a lavish lifestyle/ability to repay creditors cannot be the sole basis for dismissal under § 707(a). *See McDow v. Smith*, 295 B.R. at 78-79. Moreover, aside from a few budgetary line items, the Debtor's family size arguably justifies many of his larger household expenses. Nevertheless, the Court finds that under the totality of the Debtor's circumstances, there is sufficient cause to dismiss this case for bad faith based primarily on the Debtor's manipulation of his bankruptcy schedules to present a false financial picture. Once the Court weeded through the amended Schedules I and J, and the propounded justifications for the breakdowns contained therein, the Court concludes that allowing the Debtor to continue in Chapter 7 would be extraordinarily unfair to creditors and an affront to the bankruptcy process.

One factor considered in the totality of the circumstances analysis is whether the debtor inflated his/her expenses to disguise his/her financial well-being. *See McDow v. Smith*, 295 B.R. at 79 n.22. Debtors have an ongoing and independent duty to provide accurate and complete information on their schedules regardless of whether they were assisted by counsel in preparing their schedules. *See In re Barrows*, 399 B.R. 506, 511 (Bankr. D. Minn. 2009). "The purpose of the schedules is to ensure that there is adequate information available to the debtor's

18

creditors—there should be no independent duty placed upon the creditors to conduct an investigation to ensure that the information in the schedules and statements is true, accurate and complete." *Cho v. Park (In re Seung Chan Park)*, 480 B.R. 627, 639 (Bankr. D. Md. 2012).

Here, the most troubling aspect of this case is the skewed financial picture presented by the Debtors' amended Schedules I and J, which this Court finds were specifically created to present a state of insolvency that simply does not exist. First and foremost, the inclusion of the estimated tax payments for Dr. Bourelly's dermatology business strategically misrepresents the true state of Debtor's financial affairs. It is undisputed that the Debtor never made any estimated tax payments for Dr. Bourelly's business income. It is further undisputed that Dr. Bourelly historically took sufficient distributions from her business to cover any income tax liability and that her business had sufficient funds to do so. Yet, the amended Schedule I attributes $24,116.00 in income from Dr. Bourelly's business solely to her, and Debtor spent substantial time arguing that the $24,116.00 should not be considered available to Debtor's creditors. The amended Schedule J then apportions $5,464.00 to both the Debtor and Dr. Bourelly, for a total of $10,928.00, to cover the estimated tax payments for Dr. Bourelly's business. In other words, the amended Schedule J segregates the business income from the joint household income, but the amended Schedule I includes a substantial expense paid for by the business income as a joint expense. As stated above, this is significantly misrepresentative of the true state of Debtor's financial affairs. Although Mr. Block argued that the estimated tax liability was divided between the Debtor and Dr. Bourelly because they file a joint tax return and would both be liable for any taxes due, the Court finds this reasoning to be nonsensical. Dr. Bourelly's business had more than sufficient cash on hand to pay the estimated taxes so there is no expectation of any impending tax liability. Moreover, as Mr. Davidson testified, it makes no sense for Debtor to file a joint tax

return if it would potentially expose him to an estimated $131,136.00 in tax liability for Dr. Bourelly's business ($10,928.00 multiplied by 12).

The discrepancies in certain line items on the amended Schedule J provide further support that the Debtor manufactured his schedules to present a false reality.   Not only does the amended Schedule J differ substantially from the initial Schedule J, there was no evidentiary support for the manner in which several joint expenses were divided.   Although there was testimony explaining why Dr. Bourelly's pet expenses were significantly more than the Debtor's, and why the Debtor's recreation and transportation expenses were significantly more than Dr. Bourelly's, the division of several household expenses makes no sense and was not explained at trial.   Specifically, it is unclear why $1,271.00 a month is allocated to the Debtor for "home maintenance" while only $409 is allocated to Dr. Bourelly.   They only own and occupy one house.   It is similarly unclear why $232.00 is allocated to the Debtor for "homeowner's or renter's" insurance while $0.00 is allocated to Dr. Bourelly.   Also troublesome is the country club membership that the parties testified is a business expense of the Debtor.   The country club statements admitted into evidence reflect monthly country fees ranging from $775.60 to $1,021.35.   This amount was included in Debtor's "recreation" expense, however, he testified that Dr. Bourelly dines at the country club and their kids swim in the club's pool.   There was simply nothing in the record to justify the country club expense as a legitimate business expense that should be attributed solely to the Debtor.   In fact, the country club expense was not listed as a business expense on the Debtor's federal income tax return for 2012.

Lastly, the filing of the amended Schedule E on the eve of trial to include a grossly overstated *potential* tax liability is further evidence that the amended schedules present a false financial picture.   The amount on the amended Schedule E is identical to the DC Tax Claim filed

in Spike Club, LLC's bankruptcy case.   No such claim has been filed in the Debtor's bankruptcy case, nor is there any evidence that the D.C. Government has assessed any liability against the Debtor for Spike Club's tax liability.   Additionally, the proof of claim filed in Spike Club's bankruptcy case is for tax years 2007-2014, which means it includes at least two years of post-petition tax liabilities that would not have been assessed as of the Petition Date in the Debtor's bankruptcy case.   Further, Mr. Davidson testified, and Debtor did not dispute, that even if one assumed the Debtor is a "responsible party" liable for Spike Club's taxes, he would only be responsible for the sales and use taxes, not the franchise tax.   Thus, not only does the amended Exhibit E include taxes for post-petition periods, it includes $618,422.01 in franchise tax liability for which the Debtor has no potential liability.

The misrepresentations and unexplained discrepancies in the Debtor's carefully-crafted bankruptcy schedules disguise his financial well-being and make it impossible for creditors to assess his true economic circumstances.   This factor weighs heavily in favor of a finding of bad faith.   The fact that the Debtor retained an accountant to essentially create a fictitious financial reality after the filing of Movant's Motion to Dismiss is further evidence of the Debtor's bad faith.

In addition to the financial manipulation, there is no doubt that the Debtor can significantly reduce his expenses.   First and foremost, the Court finds there was absolutely no evidentiary support for Debtor's testimony that his Washington Wizards' season tickets and his country club membership are legitimate business expenditures.   There was no credible evidence presented that these extravagant expenses garnered any business for the Debtor or in any way enhanced his income.   Eliminating these two items alone reduces the Debtor's monthly expenses by approximately $1,500.00.   The Court also finds that should Debtor convert his case to Chapter 11, his monthly TSA payment of $1,369.00 could not be sustained.   Omitting these expenses, in

addition to the $10,928.00 monthly estimated tax liability, results in an overall reduction in monthly expenses of approximately $13,797.00. This figure does not even factor in some of the other budgetary items that appear excessive but were not necessarily challenged at trial, including home maintenance, pet care, food, and heating and electricity. Moreover, the Debtor testified that his annual income would increase by approximately $100,000.00 once contract negotiations were completed with Howard University—that provides an additional $8,333.33 in income every month. Based on these numbers, the Debtor has an additional $20,000.00 per month that could be dedicated to his creditors.

Additional indicia of bad faith present in this case include: the Debtor's complete lack of effort to repay Movant; the relatively insignificant debt listed on Debtor's Schedule F other than the matured loan owed to Dr. Bourelly; the filing of the amended Schedule E on the eve of trial to include a significantly overstated claim by the D.C. Government for which Debtor only has potential liability; the fact that the Debtor did not file bankruptcy because of sudden illness, calamity, disability, or unemployment; and the overall unfairness of the Debtor utilizing Chapter 7 of the Bankruptcy Code in light of all these factors. While most of the factors are self-explanatory, the claims listed on Debtor's Schedule F require more explanation. As stated earlier, Debtor's amended Schedule F includes various credit card claims totaling $30,785.00, a claim in favor of Dr. Bourelly in the amount of $100,000.00 based on a "Promissory Note," and numerous claims held by the District of Columbia totaling $1,285.00. The total amount of claims listed on the amended Schedule F equals $132,070.00. Debtor testified that the $30,785.00 credit card balance was incurred in the ordinary course of business and was a balance that he typically carried. This was the only evidence with respect to the credit card debt. Debtor further testified that he has never made a payment to Dr. Bourelly on the Promissory Note despite it having a

maturity date of December 31, 2013.   As for the various claims held by the District of Columbia, they range in amount from $55.00 to $200.00.   In light of the Debtor's substantial financial means, the Court questions why these minor debts for parking tickets have gone unpaid.   The Court also questions whether the $100,000.00 owed to Dr. Bourelly is truly a claim.   Not a single payment has ever been made on the Promissory Note and it expired over 2 years ago without Dr. Bourelly taking any collection action to date.   That leaves the $30,785.00 in credit card debt that again, the Court questions why the Debtor is carrying a relatively small balance compared to his substantial financial means.   Although Movant challenged the nature of the $100,000.00 unsecured debt owed to Dr. Bourelly, the rest of the unsecured claims went unchallenged. Nonetheless, the Court questions whether these debts were manufactured or purposely not paid to further disguise the Debtor's financial well-being.   The Debtor had two major creditors when he filed his bankruptcy petition—Movant and Premier Bank.   Debtor has since settled with Premier Bank, resulting in Movant holding 99% of the remaining claims.   This case is essentially a two-party dispute.

To conclude, the Court finds that a bankruptcy case may be dismissed for bad faith under § 707(a) after analyzing the totality of a debtor's circumstances.   Upon consideration of the totality of the Debtor's circumstances, the Court finds the facts of this case sufficiently egregious to warrant dismissal for bad faith.   The Court's holding is based on: (i) the manipulation of the Debtor's bankruptcy schedules to disguise his financial well-being; (ii) the Debtor's ability to repay his debts by omitting or reducing key extravagant expenses; (iii) the Debtor's lack of effort to reduce his expenses; (iv) the Debtor's lack of effort to repay his debts; and (v) the fact that the Debtor's bankruptcy filing was not due to illness, calamity, disability, or unemployment.

IV.    <u>**Conclusion**</u>

For these reasons, this Court finds sufficient cause to dismiss the Debtor's bankruptcy case for bad faith under § 707(a).   Considering the Debtor's ineligibility for Chapter 13 relief, but his clear ability to repay his debts over time, the Court will allow the Debtor an opportunity to convert his case to Chapter 11.   Failing conversion, this case shall be dismissed.   An Order consistent with this Memorandum will be entered contemporaneously herewith.


cc:    Debtor
       Debtor's Counsel
       Chapter 7 Trustee
       United States Trustee
       Counsel for The James Adkins Living Trust – Peter Mann, Esq.
       All Creditors and Parties-in-Interest


**END OF MEMORANDUM**